CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

May 28, 2025

LAURA A. AUSTIN, CLERK
BY: s/ K. SAVILLE
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MELISSA DIANA SIMMONS and<br>JAMES PATRICK BROWN,<br><br>          Defendants. | Case Nos. __7:25mj108 |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Tony T. Bradley, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent ("SA") with the U.S. Department of Veterans Affairs ("VA"), Office of Inspector General ("VA-OIG"), and have been since June 2023. Prior to working with VA-OIG, I worked as an Industry Operations Investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") from September 2015 to June 2023.

2. I graduated from the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Industry Operations Investigator Basic Training, both held in Glynco, Georgia. I also previously received training and experience in criminal investigations as a Military Police Officer in the United States Air Force. I have bachelor's and master's degrees in criminal justice.

3. I am currently assigned to the VA-OIG's Mid-Atlantic Field Office in Washington, D.C. My duties include investigating crimes committed against programs and operations of the VA by employees and non-employees, as well as serious violations of policies and procedures by high-ranking members at the VA. I am authorized to execute federal arrest and search warrants.

1

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from witnesses and other law enforcement officers. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts in this affidavit, there is probable cause to believe that Melissa Diana Simmons forged endorsements on Treasury checks of the United States, in violation of 18 U.S.C. § 510(a)(1), and that James Patrick Brown committed attempted bank fraud, in violation of 18 U.S.C. § 1344(2).

## STATEMENT OF PROBABLE CAUSE

6.      On or about May 22, 2024, VA-OIG learned that between August 2023 and December 2023, Melissa Diana Simmons and James Patrick Brown allegedly withdrew tens of thousands of dollars from the account of a 75-year-old disabled Navy and Vietnam War veteran, Individual 1. The VA-OIG assigned me to investigate these allegations. The results of that investigation, in part, are as follows.

### *Individual 1's Bank Records*

7.      As of 2023, Individual 1 was renting a well-kempt ranch-style house in Boones Mill, Franklin County, Virginia.[1] Records of Individual 1's main bank account with Truist,[2] ending in 0163, show that from on or about December 16, 2020, to around December 2022, he typically cashed out $1,000 per month as a baseline—sometimes less or more, for irregular expenses. He virtually never withdrew more in a month than his VA and social security deposits.

---

[1] Boones Mill is located within the Western District of Virginia.

[2] Early records reflect that BB&T held Individual 1's bank account. Truist formed through the merger of BB&T and SunTrust banks. Truist is a "financial institution" as defined by 18 U.S.C. § 20. I personally confirmed that Truist was FDIC insured at all relevant times noted in this affidavit.

8.  As of December 16, 2020, Individual 1 had a little under $71,000 in his account, but by December 2022, that amount grew incrementally—aside from an approximately $65,000, one-time VA deposit—to just under $170,000.

### *Simmons's Assignment to Individual 1*

9.  At some point, the VA contracted with A Nurse's Touch Home Care ("Nurse's Touch") to provide Individual 1 up to 20 hours a week of "Homemaker-Home Health Aide" services. In approximately late May 2022, Simmons qualified as a personal care attendant ("PCA") with Nurse's Touch. As a PCA, Simmons was supposed to be responsible for helping elderly, sick, and disabled clients with daily living in those clients' homes.

10. Around June 2022, Simmons was assigned as Individual 1's PCA. Nurse's Touch forbids its PCAs from soliciting direct work with their clients for up to a year after the PCA's employment. Simmons agreed to this restriction.

> **PLEASE READ CAREFULLY!!!!!**
>
> EFFECTIVE IMMEDIATELY! November 1st, 2012. Remember you are an employee of A Nurse's Touch Home Care. As an employee of the company, you are NOT allowed to offer services to any client outside of the agreement of A Nurse's Touch Home Care. This includes PPL (consumer directed services). This behavior is prohibited! Any aide found guilty of leading a client to be discharged or found guilty of offering services to a client during the time of employment or within 1 year after employment, will be subject to a lawsuit!! It doesn't matter if you quit first, you are not allowed to solicit these services from A Nurse's Touch Home Care clients!
>
> By signing below, you acknowledge that you "fully" understand the seriousness & comprehend the consequences detailed in this memo.
>
> If you have questions, please feel free to contact Trivinia Hairston.
>
> Aides Signature _Melissa Simmons_
> Trivinia Hairston RN, BSN

### *Draining of Individual 1's Account*

11. Beginning in December 2022, after Simmons's assignment as Individual 1's PCA, Individual 1's bank account records showed a new trend: he no longer saved money month-to-month by default. With rare exception, from approximately December 2022 on, Individual 1's

account was depleted due to a dramatic uptick in withdrawals. Some of these checks were in Simmons's name. Checks that weren't made out to Simmons often looked like she filled them out, matching her cleaner, looping cursive lines, instead of Individual 1's rough print. Simmons's name was written exactly as she signed it.



12. On or about May 24, 2023, a $500 check from Individual 1 was made out to Simmons's boyfriend, James Brown. From that point, more checks were made out to Brown.

*Simmons's Firing*

13. Around a year after her assignment to Individual 1, on or about June 15, 2023, Nurse's Touch fired Simmons because of ongoing errors and failing to show for an assignment with Individual 1.

*Individual 1 Moves in with Simmons*

14. At some point around this time, Simmons persuaded Individual 1 to move in with her and Brown at their house in Boones Mill, Virginia. Individual 1 allowed Simmons and Brown to use his vehicles as well, a 2009 Subaru Outback and a 2002 Ford Ranger, which were operable at the time and registered in Individual 1's name.

*Truist Staff Become Suspicious*

15. By July 2023, Simmons and Brown were making frequent trips through the drive-thru of Truist's Rocky Mount branch, located within the Western District of Virginia, to withdraw Individual 1's funds.

16.     During one such trip, the bank manager, E.B., met Individual 1 at the drive-thru window. Individual 1 was in the backseat; Simmons was driving. Although Individual 1 was coherent and properly groomed, E.B. was concerned. Individual 1 told E.B. that Simmons and Brown were his caregivers and that they lived together. Individual 1 told E.B. that Simmons and Brown became his caretakers because Simmons was his friend, and he said she offered him a place to live so he could receive better care. Individual 1 had a positive view of Simmons.

17.     On reviewing Individual 1's bank history after the meeting, E.B. confirmed that Individual 1's spending patterns had changed dramatically.

### *Simmons Added as Signatory to Individual 1's Account*

18.     On or about August 16, 2023, Simmons and Individual 1 visited Truist's Westlake branch in Hardy, Virginia. Individual 1 wanted to add Simmons to his checking account. Truist employee H.H. warned Individual 1 about the risk of losing money when adding another person, but Individual 1 dismissed the concern. Simmons was added to Individual 1's 0163 account.

19.     H.H. noted that before Simmons was added to Individual 1's account, he visited the bank about once every other month for small withdrawals for living expenses, whereas afterward, Simmons and others brought Individual 1 to the bank's drive-thru for large withdrawals multiple times a week. During this time, H.H. saw Individual 1's appearance deteriorate from upbeat to "defeated, swollen, and hunched over" with "fear in his eyes."

20.     Based on my review of Individual 1's bank records, Individual 1's funds bled at a dramatic rate after Simmons was added to the Truist account. Within 30 days, Individual 1 lost over $28,000. Simmons and Brown drew from checks up to $2,000; $3,000; and $4,000. Individual 1's Truist credit card (one he hardly used) also incurred a slew of nearly $1,700 in charges within a month after Simmons was added to the account.

### *Simmons's Attempt to Get VA Compensation*

21.     At some point after Individual 1 moved in with her, Simmons applied for VA compensation through the Program of Comprehensive Assistance for Family Caregivers ("PCAFC") for her care of Individual 1.

22.     On or about August 31, 2023, L.D., a VA licensed clinical social worker ("LCSW"), conducted a telephonic interview with Individual 1. During the assessment, Individual 1 said he had memory problems and struggled with knowing what day or time it was. During the same interview, Simmons advised that she and Brown had to push Individual 1 to bathe, groom, and eat. Simmons noted that Individual 1 would smoke with his oxygen tank or forget how to equip his oxygen.

23.     On or about September 4, 2023, Nurse's Touch discharged Individual 1 as a client. Records suggest this happened because Individual 1 moved in with Simmons.

### *E.B.'s Confrontations with Simmons and Brown*

24.     On or about September 14, 2023, Simmons and Individual 1 arrived at the drive-thru of the Truist branch in Rocky Mount for another withdrawal. E.B. told them to come inside the bank to discuss, where they met E.B. and Truist employee N.P.[3]

25.     Individual 1's nose was burnt from smoking while using his oxygen tank. He reeked of urine and feces. He seemed meek and unsure of himself and his surroundings. Individual 1 could not answer some of E.B.'s questions, although Simmons attempted to answer for him. E.B. had Individual 1 come into her office, but made Simmons wait in the lobby, which upset Simmons.

---

[3] Truist employee N.P. remembered another encounter with Simmons and Individual 1 a few days before the September 14 incident. N.P. recalled that Individual 1 seemed coached to say that Simmons and Brown were using his money for his benefit.

26.     During his private meeting with E.B. and N.P., Individual 1 explained that he added Simmons so she could buy groceries. Nevertheless, E.B. informed Individual 1 that he needed to close his account and open a new one due to the large amount of money being siphoned from the account. Individual 1 agreed, and Truist opened a new account for him without Simmons as a joint owner.

27.     During his conversation with E.B., Individual 1 couldn't remember when he last bathed, ate, or visited the VA. Individual 1 wanted to withdraw $100,000, which concerned E.B. Individual 1 looked "intimidated," confused by the situation, and asked who would take care of him if he didn't give money to Simmons. Individual 1 also said he would keep $100 of his withdrawals, but that Simmons and Brown would take the rest of his money. He explained that his large withdrawals were for various purchases, like a large screen TV, a washer and dryer, new clothes, etc.

28.     Meanwhile, Simmons was agitated and belligerent, and she hit the glass window of the office and repeatedly barged in, interrupting the private discussion with Individual 1. N.P. remembered Simmons shouting that Individual 1 had a right to his money. Simmons also threatened staff at the bank. In response, E.B. called the Rocky Mount police. When Individual 1 left, there were bits of feces in his seat because his pants were soiled.

29.     A few days later, on or about September 16, 2023, Brown and Individual 1 met E.B. at the Rocky Mount branch. Brown said he was Individual 1's new caregiver. Brown urgently wanted help getting Individual 1's VA and social security checks set up for direct deposit into the new Truist account. He also wanted to withdraw around $60,000 to $70,000. However, Brown was not a signatory on Individual 1's Truist account, and he had no authority to withdraw any money.

30.     Individual 1, meanwhile, looked even worse than before. The odor of urine and feces was intolerable to E.B. Individual 1 tried to make the withdrawal, but he appeared coached, potentially intimidated, not particularly coherent, and confused about why he was withdrawing the money. When E.B. denied the withdrawal, Brown left, indicating they would find a new bank.

### *Brown's VA Phone Call*

31.     On or about September 19, 2023, Brown made a call to the VA, which the VA recorded, attempting to arrange for direct deposit of VA payments into Individual 1's new Truist account. The call captured Individual 1, who seems confused. Individual 1 didn't know how much the VA was paying him. He did not understand the difference between a pension and compensation on the phone call.

### *Individual 1's SLUMS Exam*

32.     After E.B.'s September 14, 2023, meeting with Individual 1, Truist staff reported to Franklin County Adult Protective Services ("APS") that Individual 1 was being exploited. On or about September 21, 2023, B.B., a family services specialist with APS, visited Individual 1 at Simmons's house to investigate. Simmons explained that she was using Individual 1's money to build a tiny home for him in the backyard. Individual 1 seemed to go along with this explanation, and claimed he saw the receipts and was satisfied with how his money was spent.

33.     B.B. administered the Saint Louis University Mental Status ("SLUMS") exam[4] on Individual 1. He scored a 6 out of 30, a low result (e.g., he thought it was 2013, could not identify a triangle, and could not track the details of a simple story), well below the threshold for dementia.

---

[4] SLUMS exams are "used as a screening test for Alzheimer's disease and dementia. . . . [A] normal range is 27-30, mild dementia is in the range of 21-26[,] and dementia is 0- 20." *See United States v. Scott*, No. 21-CR-00302-GPG, 2023 WL 4196163, at *2 (D. Colo. June 26, 2023).

*APS September 29 Phone Call*

34.   On or about September 29, 2023, another family service specialist, M.S. called Individual 1 for follow-up investigation. Individual 1 sounded like he was intoxicated, with slurred speech and an inability to focus on M.S.'s questions. Individual 1 said he lived in Boones Mill with someone named "Joe." Individual 1 could not seem to understand the purpose of M.S.'s call.

*Individual 1's Carter Bank & Trust Account*

35.   On or about October 12, 2023, Individual 1 opened a bank account with Carter Bank & Trust.[5] Individual 1 received a debit card linked to the account.

36.   On or about October 24, 2023, Truist employee H.H. saw Individual 1 enter the Truist Westlake bank branch with an unknown male in his 30s, seeking to withdraw the remainder of Individual 1's account, which was about $106,000 by this point. H.H. privately asked Individual 1 if he was being coerced, and he replied, "No," but added that he was afraid he would be hurt if he didn't agree. H.H. instructed the unknown person to wait outside, prompting him to curse at her, but he complied. When investigators later showed H.H. a picture of Brown, she denied that he was the person who attempted to withdraw the $106,000 with Individual 1.

37.   Truist, meanwhile, closed Individual 1's account on or about December 14, 2023, because of continued indicia of exploitation. Individual 1's Carter account remained inactive until around January 2024, after the Truist account was closed.

*Individual 1's Hospitalization*

**38.**   On or about November 18, 2023, Simmons called Roanoke County Fire and Rescue and reported that Individual 1 was non-responsive. Emergency responders rushed Individual 1 to Roanoke Memorial Hospital ("RMH"). Simmons reported that Individual 1 had set himself on

---

[5] Carter Bank & Trust is a "financial institution" as defined by 18 U.S.C. § 20. I personally confirmed that it was FDIC insured at all relevant times noted in this affidavit.

9

fire three days prior. She said he didn't get much medical care. Individual 1 was admitted with acute respiratory failure. His oxygen saturation was critically low. Individual 1 was placed in intensive care.

### *APS November 20 Visit*

39. On or about November 20, 2023, two additional APS family services specialists (L.S. and A.M.) visited Simmons and Brown at their Boones Mill home. Simmons explained that Individual 1 was in the hospital after she came home and found him on the ground. She alleged that she spoke with hospital staff about potentially taking Individual 1 off life support.

40. Simmons and Brown denied stealing money from Individual 1. Brown reiterated that he was working on building a tiny house on the property for Individual 1 and that they purportedly used Individual 1's money to buy supplies. Simmons produced a few receipts from Lowes and a building supply company, totaling about $800 and said she could gather more receipts.[6]

41. Simmons expressed frustration with Truist. She acknowledged that Individual 1 had dementia, specifying that Individual 1 couldn't remember what happened five minutes ago. A.M. left her business card with Simmons and asked her to call when the other receipts were ready.

### *VA Check Forgeries*

42. With the closure of Individual 1's Truist account in December 2023, the VA could no longer directly deposit Individual 1's payments into that account, so they mailed checks to Simmons and Brown's house in Boones Mill, Individual 1's last known address. VA benefits checks like the ones Individual 1 received are checks written from the United States Treasury.

---

[6] APS did not retain copies of these receipts, although they memorialized the approximate amount in their records.

43. Although Individual 1 was still at RMH and then recuperating at another location, Carter bank records captured scans of four mailed VA checks, which showed they were deposited January 23 (issued January 9), February 5 (issued February 1), March 4 (issued March 1), and April 1 (issued the same day), all in 2024, into Individual 1's Carter account. The checks were each for $1,995, totaling a little under $8,000. They were signed with Individual 1's name, but the signature was in Simmons's distinctive handwriting.

44. Within weeks of each deposit, the funds were completely drained with withdrawals and debit card purchases linked to the Carter account. The expenses included almost $3,000 worth of withdrawals at an ATM in a casino; a National General Insurance auto payment of $474; $743 for an AEP electric bill; phone bills; $168 for salon expenses; and hundreds of dollars' worth of pawn shop payments under Brown's name.

*Individual 1's Discharge from RMH*

45. On or about March 14, 2024, RMH discharged Individual 1 to Carrington Place at Botetourt Commons Health and Rehab Center in Daleville, Virginia.

46. On or about April 17, 2024, shortly after Individual 1's discharge from the hospital, Dr. G. certified by letter that Individual 1 lacked decisional capacity and could not independently manage his affairs. A.W. (Individual 1's nephew) and his wife M.W. were identified as Individual 1's next of kin. They assumed power of attorney and secured the funds from Individual 1's defunct Truist account.

*Recovery of Individual 1's Property*

47. On or about May 17, 2024, investigators with the Franklin County Sheriff's Office went to Simmons's Boones Mill house, where they met Simmons. Simmons agreed she would turn over Individual 1's property to his power of attorney. Simmons stated her "old man," referring

to Brown, was still driving Individual 1's Subaru Outback.

48. That same day, Brown called one of the investigators and confirmed he was driving Individual 1's Subaru Outback. Brown indicated that he thought Individual 1 was dead. Brown further said he didn't feel he should give Individual 1's property back and that he deserved a storage fee for keeping the property for as long as he had.

49. On or about June 23, 2024, A.W. and M.W. coordinated with Simmons to retrieve Individual 1's vehicles from Simmons's house in Boones Mill. A.W. and M.W. found the Ford Ranger had been "taken apart," e.g., the spark plugs were removed, and it was inoperable. The Subaru Outback's center console had been removed and was in poor condition.

50. The vehicles were not insured while Simmons and Brown were using them. The registration had also expired for both vehicles.

### Dr. L.M.'s Observations

51. Dr. M. is a staff psychiatrist for the VA Medical Center in Salem, Virginia. Individual 1 has been Dr. M.'s patient since 2005. Based on Dr. M.'s personal observations and his review of Individual 1's SLUMS exam, Dr. M. does not believe Individual 1 had the capacity to manage his finances or daily living as of August 2023. In a note dated on or about September 7, 2023, Dr. M. wrote of Individual 1: "Veteran cognitive and physical functioning will continue to decline as an expected dementia ds [diagnosis] course."

### Simmons's Interview

52. On or about October 22, 2024, VA-OIG SA Robert Wallace and I conducted a voluntary, non-custodial interview with Simmons. She denied exploiting Individual 1 and claimed that any time she took or spent Individual 1's money, she asked him first. Simmons, when pressed, ultimately admitted to receiving Individual 1's four VA checks in the mail after Individual 1's

hospitalization, forging Individual 1's signature, depositing the checks, and spending the money. She also said Brown used Individual 1's debit card to spend the money. Simmons asked if she could pay the money back.

### *Brown's Interview*

53.    On or about January 17, 2025, SA Wallace and I met Brown at his house for a voluntary, non-custodial interview. Brown offered various reasons for how he and Simmons spent Individual 1's money, including that Individual 1 paid for new appliances in Simmons's house (because Individual 1 allegedly knew the appliances didn't work when first moving in). Brown also said he did Individual 1's auto-mechanic work.

54.    Brown was adamant that he did not take advantage of Individual 1, although toward the end of the interview he said, "I got myself in some shit."

### *Individual 1's Interviews*

55.    I and other investigators have interviewed Individual 1 since his discharge from RMH. Unfortunately, his answers have been largely incoherent, contradictory, or merely going along with questioning. He did not appear to fully grasp or remember questions about his finances or his relationship with Simmons and Brown. While APS was investigating what was happening to Individual 1, Franklin County deputies contacted Individual 1 multiple times, and he told them he did not need assistance.

## CONCLUSION

56. Based on my training and experience and the facts in this affidavit, there is probable cause that on or about January 23, 2024, Melissa Diana Simmons forged endorsements on Treasury checks of the United States, in violation of 18 U.S.C. § 510(a)(1).

57. Further, there is probable cause that on or about September 16, 2023, James Patrick Brown attempted to commit bank fraud by: fraudulently telling E.B. that he was Individual 1's new caregiver; by coaching Individual 1 to try to make a $60,000 to $70,000 withdrawal from Individual 1's Truist bank account; and by creating the false impression that Individual 1 sought to withdraw the money of his own accord, in violation of 18 U.S.C. § 1344(2).

Tony T. Bradley
Special Agent
VA-OIG

Received by reliable electronic means pursuant to Federal Rule of Criminal Procedure 4.1 and subscribed and sworn to me by telephone this ___27th___ day of May, 2025.

The Honorable C. Kailani Memmer
UNITED STATES MAGISTRATE JUDGE